United States District Court
Eastern District of Michigan

United States of America,

    Plaintiff,

v.

Dametri Wade,

    Defendant.

No. 24-cr-20528

Hon. Mark A. Goldsmith

_____/

## **GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

Dametri Wade broke his promise to the citizens of Detroit. As a Detroit police officer, Wade took an oath to protect its citizens and to uphold the law. Yet, when questioned by the FBI about a larceny, he lied. For this conduct, Wade was charged and pleaded guilty to Making a False Statement. To his credit, Wade pleaded guilty shortly after being charged for his criminal conduct, timely accepted responsibility for his actions, and resigned from the police department. But, nevertheless, Wade's offense is serious. Because of his conduct, and the need to deter others who are situated in positions of trust, the government recommends that the Court impose a sentence within the advisory sentencing guideline range, 0-6 months.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 11, 2022, a larceny occurred at a townhouse on St. Marion Street, Detroit. The homeowner told police that he heard a knock at the door, looked out his

window and saw a police car, and several individuals on his front porch. When he opened the door, the men on his porch were wearing masks. One of the masked men told the homeowner that he was being evicted and produced eviction documents that appeared to be forgeries. The men then forcibly entered his home and stole some items. The homeowner told police that they took his wallet, which contained about $200, and $4,000 worth of cologne. He reported the incident to the police and reported seeing a scout car at the scene to DPD Internal Affairs.

FBI obtained the scout car video and GPS monitoring data from Wade's police scout car for the date of the theft. The video and GPS data show that Wade and his partner left the ninth precinct at around 10:30 AM. Wade then drove his partner to a barber shop on the westside of Detroit and proceeded directly to St. Marion Street alone. Once there, scout car video shows that Wade parks his car on St. Marion near the front door of the townhouse that was the target of the larceny:



*Still photograph from scout car video*

After a few minutes, Wade moves the scout car to the rear of the building, parks, and gets out:



*Still photograph from scout car video*

The video shows Wade walking up to the front-door of a townhouse, lingering:



*Still photograph from scout car video*

before returning to the car:



*Still photograph from scout car video*

Wade once again drives the scout car to the front of the townhouse and parks for about five minutes. Wade moves the scout car away from the townhouse and positions the car so that its front is facing the target location, and it is visible from the scout car:



*Still photograph from scout car video*

A few minutes later, a white van can be seen in the scout car video arriving on St. Marion Street and driving toward Wade's location. (Exhibit 1, filed using the Court's media upload, at 00:02). The van parks in a driveway and a man, wearing a mask and a brightly colored construction vest and holding an envelope, gets out of the van and walks toward the passenger's side of Wade's scout car. (*Id*., at 00:20-00:34). The man disappears from view only to reemerge less than a minute after walking away from Wade. (*Id*., 01:04). As the man walks back toward the area of the townhouse, Wade gets out of the scout car and walks toward the rear of the building and returns about two minutes later. (*Id*., 01:37-03:25). Soon thereafter, the same man can be seen walking back toward Wade, and Wade moves his car to meet him. The two appear to interact. (*Id*., 03:59-04:18). As the man, still wearing a mask and carrying the envelope, walks in the street to the area of the townhouse, he turns toward Wade and gestures for Wade to approach him. (*Id*., 04:40). Wade complies by driving his scout car closer. (*Id*., 04:50). As Wade approaches, the man waives his hand as if giving Wade instructions. Wade again complies and stops the scout car next to the van and the man walks up to the scout car again. (*Id*., 05:02-05:44). After this brief interaction, the man walks to the van, and Wade backs his scout car to the area where he was parked before getting the signal to move closer to the townhouse. (*Id*., 05:40-06.11). Wade stays there for about six more minutes before leaving the area.

In December 2022, Wade was interviewed by the FBI regarding the larceny. During the interview, Wade told agents that he was just driving around the city and stopped around St. Marion Street because he saw a dog. He told agents that he got out of his scout car and made contact with the animal because he likes dogs. He denied any knowledge of a larceny or home invasion. Wade told agents that he thought an eviction was occurring and that he didn't want to be involved in it because they can be trouble. Wade went on to tell the agents that one person, who he assumed was involved with the eviction approached his scout car, but he shooed them away.

But the footage from Wade's scout car (Exhibit 1, filed using the Court's media upload) belies his statements to the agents. There was no dog. Wade drives directly to the location of the intended larceny and parks his car. He repeatedly moves his scout car and even gets out to walk the area near the targeted townhouse. Wade appears to be waiting for someone. Later, he repeatedly interacts with one of the masked men who arrive in a van. Contrary to his claim, he did not waive off that person. Rather, it is Wade who responds to the hand gestures of the masked man by moving his scout car closer to the targeted residence when prompted to do so. The scout car video makes clear that Wade made statements that he knew were false to agents from the FBI.

Wade agreed to waive indictment and was charged via Information with one count of false statements. Wade pleaded guilty on October 29, 2024, pursuant to a Rule 11 Plea Agreement. Sentencing is set for July 15, 2025.

Less than a month after pleading guilty, Wade was arrested and charged with Disorderly Conduct and Misdemeanor Malicious Destruction of Property. Wade drove his truck onto the lawn of his children's mother's home. Wade damaged the lawn and repeatedly honked his horn and played loud music, causing a disturbance. He pleaded guilty to both charges in state court. Wade was fined and sentenced to serve two months' probation.

**GUIDELINES AND SENTENCING FACTORS – 18 U.S.C. SECTION 3553(a)**

Section 3553(a) of the United States Code sets forth a number of factors for the Court to consider in imposing sentence. Those factors include the nature and circumstances of the offense, the history and characteristics of the offender, considerations of both specific and general deterrence, the need to provide just punishment for the offense and promote respect for the rule of law, and the need to avoid unwarranted sentencing disparities with similarly situated offenders. The government respectfully submits the following observations on those factors and their applicability to the conduct and defendant in the instant case.

A. <u>The advisory guideline range</u>

In *United States v. Rita*, 551 U.S. 338 (2007), the Supreme Court restated that the goals of the United States Sentencing Commission in formulating the Sentencing Guidelines are to carry out the objectives of 18 U.S.C. § 3553(a). In *United States v. Gall*, 128 S. Ct. 586, 601 (2007), the Supreme Court held that a district court should begin sentencing proceedings by correctly calculating the guidelines.

In the plea agreement, the parties jointly recommended under Federal Rule of Criminal Procedure 11(c)(1)(B) that certain guideline provisions apply:

- Base Offense Level of 6 (USSC § 2B1.1(a)(2))
- Loss Amount Level of 0 (USSC § 2B1.1(b)(1)(A))

The Probation Department found that Wade qualifies as a Zero-Point Offender pursuant to USSG §§ 4C1(a)(1)-(10) and reduced his offense level by two levels. (PSR § 22). Probation determined that Wade's advisory guideline range is 0-6, based upon a total offense level of 2 and a criminal history category of I. (*Id.* § 56). The government concurs in this calculation. Based on the factors enunciated in *Gall v. United States*, the government respectfully submits that the starting point here for the Court should be 0-6 months.

B. <u>The Nature and Circumstances of the Offense</u>

Wade's crime is serious. He was a police officer who took an oath to serve and to protect the citizens of Detroit. Wade was present at the scene of a crime.

8

Instead of providing information that could have been helpful to the FBI, he chose to lie. As a law enforcement officer, Wade was well aware that lying to federal agents was a crime.

    C.    <u>History and Characteristics of the Offender</u>

As is the case with many criminal defendants, an assessment of Wade's personal history and characteristics presents a mixed picture. Wade is an intelligent and well-educated individual who plainly possesses substantial skills. He has honorably served in the military and has obtained a bachelor's degree with plans of attending law school. Prior to this case he has no criminal history, which is to his credit and is indeed credited in the computation of his sentencing guideline score. He timely accepted responsibility for his offenses and has made several statements indicating substantial remorse for his criminal activity.

However, it is troubling that shortly after pleading guilty in this case, Wade committed and was convicted of another criminal offense. His conduct, while on pretrial release, is troubling and is not a good indication of Wade being compliant to supervision.

    D.    <u>Adequate Deterrence and Protection of the Public</u>

The government submits that there is little need for specific deterrence as to Wade. As a result of his conviction, it is highly unlikely that he will be employed in a

9

law enforcement position again. This limits his opportunity to commit a similar offense.

The Court's sentence will, however, serve as general deterrence to others who might consider similar conduct. Imposing a guideline sentence on Wade would likely have the laudatory effect of deterring others from engaging in similar conduct in the future.

## CONCLUSION

For these reasons, a sentence within the advisory guidelines range would appropriately weigh the nature and circumstances of the offense and Wade's history and characteristics, would promote respect for the rule of law and provide just punishment, would deter other would-be offenders from engaging in similar conduct, and would not create an unwarranted sentencing disparity with other offenders.

Respectfully submitted,

JEROME F. GORGON, JR.
United States Attorney

 s/ Robert A. Moran
Robert A. Moran
Assistant United States Attorney
211 W. Fort, Suite 2000
Detroit, Michigan 48226
313.226.9553
robert.moran@usdoj.gov
MI P46346

Dated: July 8, 2025

## CERTIFICATE OF SERVICE

I certify that on Tuesday, July 08, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Abed Hammoud
abed@abedhammoudlaw.com

                                              *s/ Robert A. Moran*
                                              Robert A. Moran
                                              Assistant United States Attorney